## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

DARRIS B.[1]

        Plaintiff,

v.                                          ACTION NO. 2:19cv577

ANDREW SAUL,

        Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Darris B. ("plaintiff") brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying his claims for a period of disability and disability insurance benefits ("DIB"), and for Supplemental Security Income ("SSI"), under Titles II and XVI, respectively, of the Social Security Act.

An order of reference assigned this matter to the undersigned. ECF No. 10. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that plaintiff's motion for summary judgment (ECF No. 14) be **DENIED**, and that the Commissioner's motion for summary judgment (ECF No. 15) be **GRANTED**.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons.

## I.    PROCEDURAL BACKGROUND

Plaintiff protectively filed his current applications for disability insurance benefits and supplemental security income on February 5, 2015, alleging he became disabled on September 24, 2013, due to diabetes, blurred vision, osteoarthritis of the left hip, obstructive sleep apnea, neuropathy, a bone spur in the right foot, hypertension, degenerative joint disease of the left knee, obesity, and breathing problems.[2]  R. 19, 319–31, 383.

After his claims were denied initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  R. 106–53, 200.  ALJ Duann heard the matter on May 17, 2017.  R. 71–80.  ALJ Duann granted plaintiff's request, on the advice of counsel, to amend his alleged disability onset date from September 24, 2013 to February 1, 2016, thereby precluding a DIB award.[3]  R. 74–77, 349, 421–22.  On May 25, 2017, ALJ Duann issued a decision awarding SSI benefits.  R. 154–65.

Notwithstanding the favorable decision, plaintiff filed a *pro se* appeal with the Appeals Council.  R. 266–69.  On March 2, 2018, the Appeals Council vacated the ALJ's decision and remanded the case.  R. 166–70.

ALJ O. Price Dodson conducted a hearing on July 25, 2018.  R. 35–70.  ALJ Dodson denied benefits in a decision dated October 26, 2018.  R. 15–27.  On August 30, 2019, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  R. 1–6.  Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

[3] Robert W. Gillikin, II, Esquire, represented plaintiff at the May 17, 2017 hearing.  R. 73, 421–22.

Having exhausted administrative remedies, plaintiff filed a complaint with this Court on October 29, 2019. ECF No. 3. The Commissioner answered on January 7, 2020. ECF No. 8. The parties filed motions for summary judgment, with supporting memoranda, on February 7 and March 9, 2020, respectively. ECF Nos. 14–16. No reply brief was filed. With the Court's permission, plaintiff filed a statement of undisputed facts on May 9, 2020. ECF Nos. 19, 20. In the absence of special circumstances requiring oral argument, the case is deemed submitted for a decision.

## II.   RELEVANT FACTUAL BACKGROUND

### A.   *Appeals Council Order*

Plaintiff's motion for summary judgment argues that ALJ Dodson failed to comply with the Appeals Council's March 2018 remand order. ECF No. 14-1 at 3–5. In vacating the May 25, 2017 award of SSI benefits, the Appeals Council identified three matters necessitating a new hearing and issued remand instructions, two of which are relevant to this appeal. R. 168–70. First, in response to plaintiff's claim that he abandoned his claim for DIB "under duress" and by trick, the Appeals Council directed the ALJ on remand to "[d]etermine whether [plaintiff] amended his alleged onset date [to February 1, 2016] with full knowledge of the consequences or under duress." R. 169.

Second, finding that the vacated decision failed to explain plaintiff's residual functional capacity ("RFC"), the Appeals Council directed the ALJ on remand to further consider plaintiff's maximum RFC "during the entire period at issue" and to support any limitations found with references to the record. R. 168–69. The Appeals Council also found wanting the prior decision's evaluation of the treating source's opinion and directed the ALJ on remand to revisit and explain the weight given to this opinion evidence, and, if necessary, to seek additional information from

3

the treating source.  *Id.*

**B.**      ***Facts Pertaining to Plaintiff's Claim of Duress in Amending his Disability Onset Date***

Before the May 17, 2017 hearing, plaintiff's attorney (Robert Gillikin, II, Esquire) notified

ALJ Duann by letter brief of plaintiff's desire to amend his disability onset date "to better comport

with the medical evidence."  R. 421–22.  At the start of the hearing and without objection, the ALJ

admitted the exhibits and the amended onset date form into evidence.  R. 74.

The   form   is   entitled   **"AMENDMENT   OF   TITLE   XVI   ONSET   DATE   &**

**WITHDRAWAL OF TITLE II HEARING REQUEST."**  R. 349.  Beneath that heading and a

listing of plaintiff's name and social security number, the form reads, in pertinent part, as follows:

> After consulting with my representative, I hereby request to amend my alleged
> onset date to: <u>February 1, 2016</u>[4] . . . .
>
> I understand that by amending to this Amended Onset Date, I am also withdrawing
> my Title II Hearing Request because the Amended Onset Date above is after my
> Title II Date Last Insured.  Therefore, my Title II claim will be **<u>DISMISSED</u>**, and
> the unfavorable lower level determination will be the final decision in my Title II
> claim.
>
> [space and lines containing plaintiff's and attorney's initials]
>
> I acknowledge that I had sufficient time to discuss the consequences of amending
> my onset date with my representative.  I understand the consequences of amending
> my onset date and I am satisfied with my counsel/representative's explanation of
> this issue.
>
> [space and line containing plaintiff's initials]
>
> I acknowledge that I am satisfied with the services performed by my representative
> in this case.
>
> [space and line containing plaintiff's initials]

*Id.*  Beneath the last set of plaintiff's initials, plaintiff and attorney Gillikin signed the form, dated

---

[4] The date "February 1, 2016" is handwritten on the form.  R. 349.

May 17, 2017. *Id.*

After placing plaintiff under oath, the ALJ reviewed the form with plaintiff and noted plaintiff's and counsel's signatures. R. 76. The ALJ advised that, by amending the onset date to February 1, 2016, plaintiff "would only be eligible for Title XVI, Supplemental Security Income . . . ." *Id.* The ALJ also told plaintiff that his "Title II claim will be dismissed, because you're no[t] eligible for Title II, as of February 1st of 2016." *Id.* When asked if he understood, plaintiff replied "[y]eah." *Id.* When asked if his attorney had satisfactorily explained these matters to him, plaintiff replied "[y]es." R. 77. Finally, plaintiff expressed his satisfaction with counsel's work on his case. *Id.* Based upon the foregoing, the ALJ stated that plaintiff "knowingly and intelligently, based on advice of counsel, requested to amend [his] onset date to February 1st of 2016, which I do believe is consistent with the medical records in this case." *Id.*; *see also* R. 158 (memorializing findings in written decision).

After the May 25, 2017 decision awarding SSI benefits, plaintiff wrote to the SSA on July 21, 2017 seeking disability benefits prior to February 1, 2016 and claiming that his medical problems dated back to "2010 – 2013." R. 423–27. Referring to his prior waiver of those benefits, plaintiff stated "I signed [the amendment form] under duress, my signature should be on file, I signed it so he wouldn't notice that it was different, plus he wasn't really paying attention, he just wanted for me to sign it so bad." R. 423. Included with plaintiff's correspondence was an annotated copy of the ALJ's decision containing a handwritten note, adjacent to a paragraph referencing the dismissal of the disability benefits claim, that reads "under distress signed knowing this could be the end of trying." R. 428.

Following the Appeals Council's March 2, 2018 remand order, the SSA received a November 11, 2018 letter from Andrea Evans, plaintiff's fiancée, describing her observations of

plaintiff's interactions with attorney Gillikin prior to the May 17, 2017 ALJ hearing.  R. 14.  Ms.

Evans' letter states that attorney Gillikin:

> presented [plaintiff] with [paperwork] and saying that he needed to sign the
> [paperwork] before they went into the courtroom.  But [plaintiff] did not want to
> sign the [paperwork] as he paced the floor and ask the lawyer why he had to sign
> the [paperwork].  The lawyer said to [plaintiff] if he didn't sign the paper that he
> would not have a case and that the Judge would deny his claim and that the next
> step would be for the case to go to federal court and that his case wouldn't make it
> that far.  He also proceeded to say that he spoke with the judge beforehand and that
> [plaintiff] needed to sign the paperwork before they could proceed on with the case.

*Id.*

### C.    *The July 25, 2018 ALJ Hearing*

#### 1.    *Background Information and Plaintiff's Testimony*

ALJ Dodson held a post-remand hearing, at which plaintiff and a vocational expert

testified, on July 25, 2018.  R. 35–70.  When plaintiff's representative[5] asserted in her opening

statement that plaintiff signed the onset date amendment form under duress, ALJ Dodson

interrupted and said he was "going to save you some time here."  R. 38.  The ALJ advised that,

because the prior decision had been vacated, he was treating plaintiff's claim as one for both DIB

and SSI based upon his original, alleged onset date of disability of September 24, 2013.  R. 38–

40.  Thereafter, neither the ALJ nor plaintiff's representative asked plaintiff any questions directed

to plaintiff's claim of duress.  Nor did plaintiff offer other evidence or witnesses to support that

claim.

Although 48-years-old as of September 2013, plaintiff was age 53 at the time of the ALJ

hearing.  R. 26, 40.  Plaintiff last worked intermittently as a cook from 2011 to 2013, but stopped

due to left leg pain.  R. 42; *see* R. 540.  Plaintiff briefly returned to working as a cook in 2013,

---

[5] Gail Peters, a social security paralegal with the Legal Aid, represented plaintiff.  R. 18, 455.

with workplace accommodations, including extra breaks.  R. 42, 59.  But, as his conditions worsened, plaintiff testified he "couldn't do it [any]more" due to his legs, knees, and poor health. R. 60–61.

At the hearing and in his disability report, plaintiff indicated he could no longer work due to:  diabetes; blurred vision; osteoarthritis in both hips; damage to the iliotibial ("IT") band; obstructive sleep apnea; diabetic neuropathy in his left foot (causing difficulty walking and daily use of a cane); bone spurs in his right foot and shoulder; left shoulder pain; hypertension; knee degeneration and pain; obesity; and breathing problems.  R. 50–54, 56, 58, 62–63, 383.  Plaintiff testified he regularly suffers from pain, triggered by movement, which he manages by taking ibuprofen and gabapentin (for neuropathy), instead of more powerful painkillers.  R. 50–51, 53 (noting he "stopped taking the pain pills"), 55, 64.  He also takes metformin, which upsets his stomach for a couple of hours, two types of insulin for diabetes, and medication for hypertension. R. 55–56, 58.

On a typical day, plaintiff gets his kids ready for school, but occasionally relies on them to rub his shoulders, which feel "frozen" in the morning and impact his ability to lift his arms.  R. 45. Plaintiff walks his children one to two blocks to the house of a friend, who drives them to school. R. 45, 61.  While his children attend school, plaintiff stays home and spends the day reading, watching television, drawing, and taking naps.  R. 45–46, 48.  Plaintiff explained he tries to limit daytime walking, so he can walk back to pick up his kids when school ends.  R. 46.  Overexertion causes plaintiff's knees, back, and hip osteoarthritis to act up.  *Id.*  Plaintiff usually relies on his fiancée to cook dinner after she finishes work, but occasionally he performs some chores, such as mopping, sweeping, cooking, doing laundry, and helping with homework.  R. 46–47.  He reports avoiding stairs while completing chores.  R. 47.

Plaintiff attends church and watches football with friends on Sundays.  R. 48.  To pass the time, he likes to draw and spends his evenings playing games and watching TV with his children. R. 48–49.  He reports, however, being unable to get onto his knees to play with his children, and has difficulty sitting normally, laying on his side, twisting at his hips, and using a cane due to pain. R. 52–53, 65.  Plaintiff is depressed by his inability to care for his children and attend school and sporting events as frequently as he would like.  R. 65. Pain in his ankle, knees, hip, and left leg prevents him from grocery shopping without the use of a cart and requires rest upon returning home. R. 48, 65.  His conditions caused plaintiff to stop doing yard work in 2013 or 2014.  R. 47– 48.  Due to foot neuropathy, plaintiff stated he no longer drives and uses a cane when walking.  R. 41, 65–66 (noting he takes the bus or finds others to drive him and his kids).  After standing and before walking with his cane, plaintiff waits for the feeling to return to his foot, in order to avoid falls.  R. 66.  Plaintiff sleeps using a CPAP machine, but sleeps five hours or less to avoid idiopathic hemoptysis. R. 49.

### 2.    *Hearing Testimony by Vocational Expert*

Robert Edwards, a vocational expert ("VE"), also testified at the hearing.  R. 18, 66–69. He identified plaintiff's past relevant work as including work as a cook, hand-spray operator, groundskeeper, and lead worker.  R. 67.  The ALJ presented VE Edwards with several hypotheticals premised on a person of plaintiff's age, education, past work experience, and RFC. R. 67–69.  One of these hypotheticals asked whether jobs existed in the national economy for an individual capable of light exertion, including standing and walking up to four hours out of an eight-hour workday; bending, stooping, or crouching only occasionally; and avoiding ladders and scaffolding, jobs involving the operation of foot controls, and reaching overhead.  R. 67–68.  VE Edwards responded that such a person could work at unskilled jobs with a light exertional level,

8

such as an information clerk, office helper, and clerical checker. *Id.*

**D.    *Relevant Medical Record***

Unless otherwise noted, the records described below mostly refer to treatment plaintiff received at, or in conjunction with, visits to the Ambulatory Care Center clinic, operated by Sentara Healthcare in partnership with Eastern Virginia Medical School, in Norfolk, VA.

After being diagnosed with diabetes mellitus in 2010, plaintiff has managed the condition with medication.[6] R. 621, 625, 627, 730, 1007. In 2010, plaintiff underwent imaging (MRI and x-rays) of his left hip, left knee, and right foot, apparently in response to reported pain. R. 714–16, 720. The primary radiological findings were: (1) "[m]ild bony proliferative changes" in both hip joints; (2) moderate and mild degenerative joint disease at the left hip and knee, respectively, without fractures; and (3) dorsal tarsal and calcaneal bone spurring in the right foot, without any acute bony abnormality, fractures, or dislocation. *Id.*

In March 2011, plaintiff began physical therapy to treat complaints of daylong, throbbing, left thigh pain, adjacent to his IT band. R. 604–05 (walking or standing for 30 minutes triggered the problem, which dated back over two years). A physical therapist found plaintiff's IT band to be palpably taut and assessed him as a good candidate for therapy. R. 605. A month later, after plaintiff reported "feeling so much better" and indicated it took "much longer for pain to come on," plaintiff and his therapist agreed to his discharge to a home exercise program. R. 588, 592.

On June 14, 2013, plaintiff also began physical therapy for right foot pain caused by bone spurs. R. 545, 547. Plaintiff traced the onset of this pain to his 2010 diabetes diagnosis, but said

---

[6] Plaintiff also experienced diabetic neuropathy following this diagnosis; but, on January 13, 2016, plaintiff told Dr. Farnen, a podiatry surgical resident, his neuropathy had improved with the medication gabapentin. R. 1074–75 (referencing diabetic peripheral neuropathy, diminished sensation bilaterally, no infections/lesions, and direction to follow-up in nine months).

that it had worsened and spread throughout his foot. R. 547. After a couple of weeks in therapy, plaintiff reported "no real change" and sought discharge to pursue getting "lateral borders added to his orthotics." R. 518. During therapy sessions on June 27 and July 9, 2013, plaintiff reported pain levels of "still 6/10 every day, and gets to 7–8/10 at night." *Id.*; R. 539.

On March 4, 2015, a podiatry surgical resident conducted a diabetic foot check upon plaintiff, who stated he needs "more [gabapentin] for neuropathy pain" and reported having cramps "sometimes" when walking or standing too long. R. 733–34. An examination revealed diminished epicritic and protective sensation bilaterally, a small dorsal prominence on the right foot (without infections/lesions), full range of motion in the ankle and joints of the feet, without pain or crepitus, and 5/5 muscle strength. R. 734. Plaintiff was referred for an arterial peripheral vascular evaluation, which found "[n]ormal lower extremity arterial waveforms and pressures" bilaterally. R. 743.

In conjunction with the reconsideration of his claim for social security benefits, in July 2015 plaintiff's right knee and left hip were x-rayed. R. 130, 135, 138, 793, 802–04. The x-rays revealed: "[m]oderate bilateral hip joint osteoarthritis," "[m]ild degenerative changes in the sacroiliac joints," and "[m]ild medial and patellofemoral compartment osteoarthritis" in the right knee. R. 802–04. When treated for a week-long episode of radiating, right hip and back pain on July 22, 2015, an emergency room nurse observed plaintiff to "ambulate[] with a steady gait from [the] waiting room." R. 788. When examined, however, plaintiff exhibited an "antalgic gait" when standing and bearing weight, with limited range of motion due to pain. R. 790. After receiving pain medication, plaintiff was discharged in stable condition and without pain. R. 788. During a follow-up visit on August 31, 2015, plaintiff's gabapentin dosage was increased from 400 to 600 mg. to treat diabetic neuropathy. R. 780–81, 805.

On December 14, 2015, an internal medicine resident, Dr. Shaghayegh Mirshahi, saw plaintiff at the clinic on a follow-up appointment for, among other things, diabetes, hypertension, sleep apnea, and hemoptysis, rather than for knee or hip pain. R. 1069–74; *see* R. 893–94 (identifying patient problems on that date as hyperlipidemia and hemoptysis), 1004 (listing diagnoses). Dr. Mirshahi ordered various lab tests, including an echocardiogram, gave a flu shot, and referred plaintiff to podiatry for a foot exam. R. 1016–18; *see* R. 999–1000 (listing unremarkable echocardiogram results).

On February 11, 2016, Dr. Mirshahi completed and signed a one-page medical source statement to be faxed to plaintiff's attorney. R. 807. Aside from writing out plaintiff's conditions, Dr. Mirshahi's statements are recorded by means of check marks. *Id.* He identified plaintiff's conditions as "[d]iabetes with neuropathy, hypertension, sciatica, hepatic steatosis, hyperlipidemia, [and] obstructive sleep apnea." *Id.* Dr. Mirshahi listed plaintiff as having sciatica, an abnormal gait, pain in his left hip, left knee, right foot, diabetic neuropathy in his feet, shortness of breath, fatigue, malaise, and an unspecified "other." *Id.* He reported that plaintiff could frequently lift less than 10 pounds, occasionally lift items weighing 10 to 20 pounds, and rarely lift 50-pound items. *Id.* He indicated that plaintiff could sit less than two hours and stand/walk less than two hours during an "8-hour workday (<u>without</u> accommodations)." *Id.* Finally, if working full-time, Dr. Mirshahi estimated plaintiff's impairments would cause him to be absent from work "4+ days/month." *Id.*

Plaintiff continued to seek care for pain in his right foot, knees, hips, and IT band in 2016 and 2017. On June 20, 2016, plaintiff sought treatment at the emergency room for moderate knee[7]

---

[7] The notes contain alternating references to whether the left or right knee was treated. R. 882–83, 886.

pain lasting roughly two weeks.  R. 880–83.  Nursing notes reflect that plaintiff walked from the waiting room to the treatment bay "with no difficulty."  R. 882.  Noting prior similar complaints and treatment history, an examination found him able to bear weight, the absence of tenderness, flexion to 90 degrees, and negative results on various tests for identifying knee problems.  R. 884. Roughly one hour after arrival and finding no need for x-rays, plaintiff was discharged with an ace wrap, a prescription for Tramadol, information about osteoarthritis, and directions to engage in weight-bearing activity as able and use crutches otherwise.  R. 882, 884–86, 890–91.  Three days later, when treated at the emergency room for a cough, nursing notes reflect that, upon discharge, plaintiff "ambulated out of the [emergency department] with steady gait."  R. 901.

On October 4, 2016, x-rays of plaintiff's right ankle revealed:  (1) "[s]purring of the anterior talus . . . likely account[ing] for the palpable abnormality reported by the patient in the anterior lateral aspect of the ankle;" and (2) that a "[s]pur at the insertion of the Achilles tendon on the calcaneus suggest[s] chronic Achilles tendinitis."  R. 1050.  On this date, plaintiff was also referred for physical therapy for chronic knee pain.  R. 1051, 1108 (noting left knee "[n]ormal in appearance and can bend and bear weight").

During a therapist's October 17, 2016 evaluation, plaintiff complained of left knee swelling and "pain for years," which had recently increased, with only minimal relief from medications.  R. 829.  After beginning therapy, plaintiff reported fluctuating knee pain.  R. 841, 844, 846, 874, 929, 1129.  For example, after reporting on October 27, 2016 that his pain was "not as bad as last time," plaintiff complained his knee was "bad and really hurting" on November 1, 2016.  R. 841, 844, 846.  On November 8, 2016, plaintiff visited the emergency room for left knee pain and leg swelling.  R. 929 (noting that "[p]atient states he did a lot of activity at his sons football game . . . and his PT sent him in due to increased pain and swelling" to rule out a blood clot).  R. 929–30.

12

A musculoskeletal exam was "[p]ositive for myalgias," but "negative for joint swelling, arthralgias, gait problem and falls." R. 931. A knee exam revealed no effusion and normal range of movement and testing revealed the absence of a deep vein thrombosis or pulmonary embolism. R. 931, 946. Plaintiff was discharged with a prescription for Norco, information about leg cramps, and told to follow-up at the clinic. R. 930, 934–35, 940–41.

After continued therapy on November 10 and 15, 2016, plaintiff "climbed the [clinic's] stairs" due to an elevator malfunction, reported his "leg is doing better," and was ambivalent about continued therapy. R. 861, 864. On November 17, 2016, plaintiff reported he stopped taking one pain medication and therapist notes indicate he "[t]olerated [therapeutic] exercises well without complaint." R. 865, 868. After meeting some therapeutic goals and making progress on others, R. 872, 877, on December 13, 2016, plaintiff advised the therapist on that he would "like to be done" because his pain was now only "5–6/10 at [the] end of [a] long walk" and he can walk to school "without pain[,] which is much better than before," R. 874. *See* R. 876 (noting "'my knee is doing good [and] I want to try it on my own for a couple of months'"); R. 877 (noting ability "to tolerate walking 4 blocks," increased left hip and knee strength to 4+/5, "to negotiate stairs more easily," and increased left knee range of movement); *see* R. 824 (classifying plaintiff as an "[i]ndependent community ambulator" at "[s]tage 5").

Six days later plaintiff visited the clinic complaining of knee pain, but acknowledged that physical therapy "helped considerably." R. 1112. Treatment notes indicate that plaintiff was "[u]sing cane as needed now." *Id.* An examination revealed no swelling, but noted crepitus with extension of the left knee. R. 1114.

On January 2 and 5, 2017, plaintiff received treatment at the emergency room for a recent bout of left hip pain radiating to his left knee. R. 952–98. On the first occasion, plaintiff reported

13

moderate pain upon palpitation of the hip, declined flexion and extension due to pain, had full range of motion in his knee, and was prescribed a lidocaine patch and discharged in less than one hour.  R. 955–56, 967.  On the second occasion, plaintiff reported that he was unable to walk due to hip pain, had sciatica on the right side of his back, and rated his pain at 8/10, at rest.  R. 976–77.  An examination was "[p]ositive for arthralgias (**left hip pain**) and gait problem (**secondary to hip pain**)," revealed tenderness at the hip, but "no swelling, . . . crepitus[, or] deformity."  R. 978; *see* R. 977 (noting plaintiff ambulated during examination).  X-rays of the left hip primarily indicated the presence of moderate osteoarthritis and the absence of acute fractures and dislocations and acute osseous abnormalities.  R. 995.  After treatment for pain, the hospital discharged plaintiff and advised him to see an orthopedist.  R. 977.

On January 10, 2017, plaintiff returned to the clinic, following up on his emergency room visits, and walked using a cane "for left knee issues."  R. 1117 (also noting plaintiff's report of little pain relief from taking Tramadol, Naprosyn, and Neurontin).  An examination found no lower extremity swelling, normal range of movement in the left hip and knee, no musculoskeletal joint tenderness, and "5/5 upper and lower extremity strength."  R. 1121–22.  After a February 9, 2017 visit at which plaintiff spoke of "disabling" pain and his efforts "to get disability," the clinic referred him to an orthopedist.  R. 1123–24, 1138.

On March 8, 2017, Dr. Paul Warren, an orthopedist at Atlantic Orthopedic Specialists, examined plaintiff and reviewed his hip/pelvis x-rays from January 5, 2017.[8]  R. 1133.  Dr. Warren's physical examination of the left hip found "no pain with gentle flexion and extension

---

[8] Dr. Warren's notes recite he previously treated plaintiff in 2011, and diagnosed "primarily greater trochanteric bursitis of the left hip" and prescribed physical therapy.  R. 1133; *see* R. 1135–36, 1142.  At that time, Dr. Warren reviewed plaintiff's 2010 MRI, which found no fractures, "some mild bony peripheral changes of both hips," and "no significant pathology."  R. 1133.

[and] internal or external rotation . . . ." *Id.* Plaintiff exhibited, however, significant tenderness "over the greater trochanteric region along the IT band . . . [with] pain into the groin region" upon palpitation of the IT band. *Id.* Although noting plaintiff's hip/pelvis x-rays from January 10, 2017 were read "as suggesting" moderate left hip arthritis, Dr. Warren concluded otherwise. *Id.* He noted the "x-ray looked fantastic," with "virtually no arthritis in either hip," with "well preserved" joint spaces shown in both lateral and anteroposterior views, with no or minimal signs of spurring, and with "[n]o signs of fracture or other bony abnormalities . . . ." *Id.* Dr. Warren diagnosed "primarily greater trochanteric bursitis and IT band inflammation" and recommended physical therapy, with ultrasound and electronic stimulation. R. 1134.

On May 11, 2018, plaintiff returned to the emergency room complaining of bilateral neck pain, lasting a week, "in his trapezius areas laterally towards the shoulders." R. 1158 (also noting "[h]e says he walks with a cane and has . . . to switch arms lately because of shoulder pain"). Examination revealed no numbness or weakness, full range of motion in the shoulders, contracted trapezius muscles with trigger points, and "5/5 grip, elbow flexion/extension, shoulder flexion, abduction, and adduction strength" bilaterally. R. 1159. Plaintiff was discharged with a prescription for Flexeril to relax his muscles, and told to take ibuprofen and Tylenol. R. 1168. A June 8, 2018 ultrasound revealed "mild acromioclavicular joint distention with synovial thickening" and an impression of "acromioclavicular osteoarthritis and joint effusion/synovitis." R. 1151. The x-rays revealed "mild . . . degenerative change," "[m]ild . . . spurring" and an impression of "[n]o acute osseous findings" and "[n]o obvious mass identified . . . ." *Id.*

## E.    *State Agency Physician Reviews*

On July 20, 2015, state agency physician R.S. Kadian, M.D., opined on initial review that plaintiff was capable of less than the full range of light work, and would be able to sit for roughly

six hours, and stand and/or walk for the same time period in an eight-hour workday, with normal breaks. R. 113–14. At the reconsideration stage, on October 13, 2015, state agency physician James Wickham, M.D., reached similar conclusions regarding plaintiff's exertional limitations, but opined plaintiff possessed a greater ability to push and/or pull (including operating hand and/or foot controls) than Dr. Kadian. R. 137–38.

### III.   THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[9] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). Specifically, the ALJ considered whether plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents him from performing any past relevant work in light of his residual functional capacity; and (5) had an impairment that prevents him from engaging in any substantial gainful employment. R. 18–27. Because plaintiff's claim for DIB and SSI was before the ALJ on remand, the ALJ incorporated into the five-step analysis a discussion of Appeal Council's three remand instructions. R. 18–27, 169.

---

[9] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a); *accord* 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. §§ 404.1505(a), 416.905(a). A claimant seeking SSI due to a disabling condition must also establish financial need, among other requirements. *See* 42 U.S.C. § 1383.

First, ALJ Dodson found that plaintiff amended his onset date of disability knowingly and voluntarily, rather than acting under duress or because he had been tricked into doing so. R. 18–19. ALJ Dodson based this finding upon the signed, amended onset date form, the prior ALJ's questioning and explanation of that form and its consequences to plaintiff, plaintiff's expression of satisfaction with his attorney's explanation of the form and work on his behalf, and plaintiff's professed understanding of the consequences of amending his onset date. *Id.*

Next, the ALJ determined that plaintiff met the insured requirements[10] of the Social Security Act through September 30, 2015, and had not engaged in substantial gainful activity since September 24, 2013, his alleged onset date of disability. R. 19, 21.

At steps two and three, the ALJ found that plaintiff's osteoarthritis and diabetic neuropathy constituted severe impairments. R. 21. The ALJ classified any additional impairments as non-severe. R. 21–22. The ALJ further determined that plaintiff's severe impairments, either singly or in combination, failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 22. As part of this determination, the ALJ considered plaintiff's obesity in accordance with Social Security Ruling ("SSR") 02-1p, finding it was not by itself medically equivalent to a listed impairment, and did not increase the severity of any coexisting or related impairments. *Id.*

The ALJ next found that plaintiff possessed the RFC to perform light work, subject to the limitations that he: (a) "can stand and/or walk for four hours in an eight-hour workday"; (b) "can occasionally bend, stoop, or crouch"; (c) "has to avoid ladders and scaffolding"; (d) "has to avoid

---

[10] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

jobs requiring the operation of foot controls"; and (e) "has to avoid reaching overhead."[11] R. 22–25.

In making his RFC assessment, the ALJ gave moderate weight to the 2013 unfavorable ALJ decision, which determined plaintiff was not under a disability and could perform less than the full range of medium exertional level work. R. 24–25, 87, 94. Based upon new medical evidence of plaintiff's moderate bilateral hip joint osteoarthritis and mild degenerative changes, the ALJ determined plaintiff was limited to walking and/or standing for four hours in an eight-hour workday, and could perform a limited range of light exertional level work. R. 25. The ALJ also gave moderate weight to the opinions of state agency physicians that plaintiff could perform less than the full range of light exertional level work and stand/walk and/or sit for six hours in an eight-hour workday, finding them only partially consistent with the evidence noted above concerning moderate osteoarthritis and mild degenerative changes. R. 25, 113, 124, 137, 148.

The ALJ gave little weight to Dr. Mirshahi's opinion in the medical source statement, finding it inconsistent with the evidence. R. 25. Although Dr. Mirshahi opined that plaintiff could only stand and/or walk for less than two hours in an eight-hour workday, and would be absent from work four or more days per month, the most recent medical records documented only mild to moderate exam findings, as well as good progress in physical therapy, better range of motion in his knees, and virtually no arthritis in his hips. R. 25, 771, 802, 807, 878, 1066, 1133. Based on

---

[11] SSA defines "light work" as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job falls in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b), 416.967(b).

this evidence, the ALJ characterized Dr. Mirshahi's findings as "extreme," and unsupported by the objective medical evidence. R. 25.

Based upon this RFC assessment, the ALJ determined at step four that plaintiff could not perform his past relevant work as a cook, hand spray operator, groundskeeper, or lead worker, because the demands of those positions exceeded plaintiff's current RFC. R. 25–26. At step five, however, the ALJ found that, considering plaintiff's age (53 years old), high school education, work experience, RFC, as well as the VE's hearing testimony, "jobs . . . exist in significant numbers in the national economy that [plaintiff] can perform." R. 26–27.

Accordingly, the ALJ concluded plaintiff was not under a disability from September 24, 2013 through the date of the ALJ's decision and was ineligible for a period of disability, DIB, or SSI benefits. R. 27.

## IV.    **STANDARD OF REVIEW**

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig,* 76 F.3d at 589; *Hays,* 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig,* 76 F.3d at 589 (quoting *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano,* 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

## V.   ANALYSIS

*A.     **Substantial evidence supports the ALJ's determination that plaintiff knowingly and freely amended his onset date of disability. Further, by evaluating plaintiff's claims based on a September 24, 2013 alleged onset date, the ALJ relieved plaintiff of his agreement to a later onset date and obviated any claim of error.***

Plaintiff argues the ALJ erred in disregarding the Appeals Council's instruction "to explore [plaintiff's] claim of duress at the 2018 hearing . . . ." Pl.'s Br. in Supp. of Pl.'s Mot. For Summ. J. ("Pl.'s Mem."), ECF No. 14-1 at 4. Plaintiff contends that, after promising "[e]arly in the hearing" to explore plaintiff's claim of duress, the ALJ never returned to the matter. *Id.* Instead, plaintiff contends that the ALJ evaluated his duress claim only by reviewing the transcript of the May 17, 2017 hearing before ALJ Duann. *Id.* This limited review, plaintiff contends, failed to consider that plaintiff has a witness who overhead plaintiff and attorney Gillikin discuss whether to amend plaintiff's onset date. *Id.*

20

The Commissioner contends the ALJ complied with the remand order and found that plaintiff knowingly amended his alleged onset date, and was subjected to neither trickery nor duress. Mem. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem."), ECF No. 16 at 2, 21–22. Alternatively, the Commissioner asserts that, even if plaintiff had amended his onset date under duress, his contention is "moot because the ALJ considered his claim as of his *initial* alleged onset date of disability of September 24, 2013." *Id.* at 22.

The Appeals Council charged the ALJ with "determin[ing] whether the [plaintiff] amended his alleged onset date with full knowledge of the consequences or under duress," R. 169, and the ALJ did so and considered the evidence of record.[12] The ALJ considered: (1) the form signed (and initialed) by plaintiff amending his onset date to February 1, 2016 and agreeing to dismissal of his claim for DIB, R. 349; (2) ALJ Duann's explanation of that form to plaintiff, including that such an amendment would limit his claim for SSI benefits only and preclude eligibility for DIB, R. 76–77; (3) plaintiff's statement under oath that he understood how amending his onset date would affect his claims, R. 76; (4) plaintiff's statement under oath expressing satisfaction with counsel's work and his explanation of the change, R. 77; and (5) plaintiff's after-the-fact claim that he had been forced into signing the amendment form, R. 423. The ALJ correctly concluded that plaintiff, having been advised by both his attorney and the ALJ about the nature and effect of

---

[12] Under Virginia law, a claim of duress requires proof that a party to a transaction engaged in wrongful threats to induce a counterparty to enter into the transaction, thereby preventing the exercise of his or her free will. *Am. United Life Ins. Co. v. Mays*, No. 2:17cv99, 2017 WL 3262251, at *5 (E.D. Va. July 31, 2017) (citations omitted). The related concept of undue influence requires proof that the free agency of a contracting party was overcome, for example, by potential abuse of a special relationship or when suspicious circumstances coupled with a party's weakness of mind cast doubt on an agreement's validity. *Id.* at *6 (citations omitted).

the change and raising no concerns thereto, knowingly, voluntarily, and intelligently chose to amend his onset date and waive his claim to disability insurance benefits.[13]  R. 18–19.

Plaintiff's suggestion that the Appeals Council required the ALJ to do more is at odds with the language of the remand order.  Compare R. 169 ("[d]etermine whether [plaintiff] amended . . . with full knowledge," etc.) with Pl.'s Mem. 4 ("explore [plaintiff's] claim of duress at . . . the hearing").  Although perhaps ALJ Dodson could have inquired at the hearing about the basis for plaintiff's duress claim, he committed no error in focusing upon the events contemporaneous with ALJ Duann's receipt and acceptance of plaintiff's written amendment request.  Charged with weighing plaintiff's after-the-fact, bald assertion that he "signed [the form] under duress," R. 423, against plaintiff's solemn declarations under oath before a judge, ALJ Dodson prudently assigned greater weight to the latter.  Cf. Walton v. Angelone, 321 F.3d 442, 462 (4th Cir. 2003) (citing Fields v. Att'y Gen. of Md., 956 F.2d 1290, 1299 (4th Cir. 1992) (noting that "[a]bsent clear and convincing evidence to the contrary, a defendant is bound by the representations he makes under oath during a plea colloquy")); Little v. Allsbrook, 731 F.2d 238, 239–40 n.2 (4th Cir. 1984) (noting that "statements . . . made while under oath" at a plea hearing are not simply "empty gestures," but rather are binding and of "considerable importance" absent "clear and convincing evidence to the contrary").  Plaintiff's untimely assertion of duress, nearly two months after the ALJ Duann's ruling and only after his attorney's legal strategy succeeded, also supports ALJ Dodson's decision

---

[13] A claimant must have insured status to be eligible for DIB.  See 20 C.F.R. § 404.130.  Thus, a claimant must establish disability prior to his date last insured, the date his insured status expires. 20 C.F.R. § 404.131(a).  Plaintiff's date last insured was September 30, 2015.  R. 19, 21, 366.  By amending his onset date to February 1, 2016, after his date last insured, plaintiff became ineligible for DIB.

to focus upon the contemporaneous events. R. 423, 427 (alleging duress and seeking DIB on July 21, 2017).

Although plaintiff suggests other evidence supports his duress claim, he failed to present it to the ALJ. Pl.'s Mem. 4 (referencing an unsworn statement in the record by "a witness [with] personal knowledge"). The evidence referred to is Andrea Evans' letter of November 11, 2018.[14] R. 14. This letter, however, was written and supplied to the SSA after ALJ Dodson heard (July 25, 2018) and decided (October 26, 2018) plaintiff's case. R. 15, 35. Therefore, it could not have been considered by the ALJ and may not now be considered by the Court. *See Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996) (noting that district courts reviewing an ALJ decision "cannot consider evidence which was not presented to the ALJ").[15] At the ALJ hearing, plaintiff had an opportunity to testify about duress and failed to do so. R. 40–66. Similarly, plaintiff declined the opportunity to present other evidence, including the testimony of his fiancée and others, to support his duress claim. When the ALJ inquired if plaintiff desired to call other witnesses, plaintiff's representative said "[n]o sir." R. 66.

---

[14] Ms. Evans' letter contains no information about any association with plaintiff. Plaintiff's November 9, 2018 request for review of ALJ Dodson's decision, however, states he is "also sending a letter wrote by my fiancé, who was there when the Lawyer ([from the law firm] Rutter & Mills) said the things he said and why I signed it (under duress)." R. 305; *see also* R. 299 (noting "I had my fiancé for proof of the under duress, she was there during the first case every step she heard [everything] the lawyer said").

[15] To the extent that plaintiff requests a "remand . . . to explore the issues identified in the [Appeals Council's] 2018 remand order," Pl.'s Mem. 5, he has failed to establish good cause for not supplying Ms. Evans' information to ALJ Dodson. *See* 42 U.S.C. § 405(g) (authorizing remand to the Commissioner for new, material evidence if good cause exists to excuse the failure to submit the information in the prior proceeding). Ms. Evans was known to plaintiff as early as the date of the hearing before ALJ Duann in May 2017, as well as by July 21, 2017, when plaintiff first alleged duress; over a year before ALJ Dodson heard plaintiff's case on July 25, 2018. R. 35, 71, 423.

Nor did the ALJ promise to take up the matter of duress at any point in the hearing. *See* Pl. Mem. 4 (asserting that the ALJ "promise[d]" to explore the duress issue during the hearing). Instead, the ALJ relieved plaintiff from his prior written waiver of his claim for disability benefits. The ALJ told plaintiff "[y]ou're alleging disability beginning in September of 2013. We're going to assume that's the alleged onset of disability." R. 40. This action opened the gates for plaintiff to again pursue an award of both SSI and DIB and nullified plaintiff's amendment of his onset date. Although the ALJ's preemptive grant of a portion of the relief plaintiff sought on remand arguably made the presentation of evidence of duress unnecessary, the ALJ in no way foreclosed the presentation of such evidence at the hearing. Accordingly, the ALJ's finding that plaintiff knowingly and voluntarily amended his onset date and waived his DIB claim is supported by substantial evidence. Also, the ALJ's decision to release plaintiff from the waiver obviated the claim of error he now presents.

**B.** **Substantial evidence supports the ALJ's RFC determination and his evaluation of the treating source's opinion.**

Plaintiff argues that ALJ Dodson also disregarded the Appeals Council's order by conducting an insufficient and cursory analysis of plaintiff's RFC, as well as of Dr. Mirshahi's treating source opinion. Pl.'s Mem. 3–4; R. 169. These claims challenge the ALJ's RFC finding between steps three and four of the sequential five-step analysis. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).

**1.** **The ALJ's RFC assessment complied with the remand order and is supported by substantial evidence.**

RFC represents a claimant's ability to "meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. §§ 404.1545(a)(4), 416.945(a)(4). It represents the most a claimant can do in spite of any limitations. *Hines v. Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006);

*see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  To facilitate an RFC assessment, a claimant

supplies pertinent evidence and the Commissioner assembles a "complete medical history."  20

C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).  The ALJ may consider statements about a claimant's

abilities provided by medical sources, as well as non-medical evidence, including a claimant's

views about limitations resulting from his symptoms. *See id.*  After considering all the evidence,

the ALJ's duty is to make an RFC assessment. *Id.*

Plaintiff objects to the ALJ's RFC analysis, arguing it is cursory and overlooks medical

and non-medical evidence supporting his disability claims. Pl.'s Mem. 3.  Plaintiff faults the ALJ's

finding that his neuropathic pain "improved" with gabapentin, for failing to weigh the degree of

improvement—"from poor to fair or fair to good or any other measure." *Id.* (also suggesting that,

because the note concerning improvement is contained on only one of a 118-page exhibit, the

ALJ's review was insufficient).  Conceding the ALJ considered plaintiff's use of a cane, plaintiff

faults the ALJ for not quantifying the frequency of such use when assessing RFC. *Id.* Lastly,

plaintiff argues the ALJ misinterpreted his statement about his desire to engage in a home exercise

program, in lieu of physical therapy, as a sign of improvement. *Id.* Instead, plaintiff construes the

statement as a sign of a lack of progress and the need for "more investment of time." *Id.*

The Commissioner disagrees, arguing the ALJ properly identified an RFC for light work

with some restrictions, predicated upon specific references to the medical record, examinations

with only mild to moderate findings, a conservative treatment history, plaintiff's statements,

testimony, and symptoms, and his positive response to physical therapy and medication

management. Def.'s Mem. 1–2, 17–19.

ALJ Dodson determined plaintiff could perform light work, with certain restrictions,

including a limitation to standing and/or walking for four hours in a normal workday. R. 22.  The

ALJ found that "[o]verall, the medical evidence of record generally does not support the claimant's alleged loss of functioning." R. 24. He further found that plaintiff's statements about his symptoms were "not entirely consistent with the medical . . . and other evidence in the record . . . ." R. 23–24. (noting mostly "mild to moderate exam findings, supporting a conclusion that the [plaintiff's] symptoms are moderate at worst"). These conclusions find ample support in the record.

As noted by the ALJ, although plaintiff suffered from hip and knee osteoarthritis, imaging of those joints showed only mild to moderate conditions. R. 24–25. A 2010 MRI of plaintiff's hips showed only "mild . . . changes" and "no significant pathology." R. 1133. When imaged in 2015, plaintiff's hips showed moderate hip joint osteoarthritis and only mild degenerative changes in the sacroiliac joints. R. 802–03. Roughly two years later, plaintiff's hip condition improved. As noted by the ALJ, Dr. Warren, an orthopedist who reviewed plaintiff's January 2017 hip and pelvic x-rays, found the "x-ray looked fantastic," with "virtually no arthritis in either hip," with "well-preserved" joint spaces, little to no spurring, and no evidence of "fracture or other bony abnormalities." R. 1133–34. Similarly, imaging of plaintiff's knees revealed only mild osteoarthritis. R. 804.[16]

---

[16] The ALJ's conclusion regarding the absence of functioning loss applies equally to the bone spurs in plaintiff's right foot and shoulders. Although plaintiff complained of pain associated with ankle spurs in 2013, he sought discharge from physical therapy to pursue modified orthotics. R. 518, 539; see R. 734 (noting full strength and range of motion, without pain, in ankle and foot joints in 2015). Although x-rays in October 2016 revealed spurs in his right ankle, plaintiff sought no subsequent treatment for complaints about this condition, and was referred for physical therapy for knee, rather than ankle, pain. R. 1050–51; see R. 829 (complaining of knee, but not ankle pain). Finally, although plaintiff complained of neck and shoulder pain in May 2018, an ultrasound and x-rays revealed "mild . . . degenerative change" and "mild . . . spurring," consistent with examination findings supporting regular functioning. R. 1151, 1158, 1168.

Although plaintiff often sought treatment and complained about knee and/or hip pain, the findings upon examination were, as noted by the ALJ, often unremarkable and less than fully consistent with plaintiff's complaints. R. 23–24, 788 (walked "with steady gait"), 882 (walked "with no difficulty"), 884 (able to bear weight, good flexion, and negative test results for knee), 901 (three days later walked "with steady gait"), 931 (normal left knee range of movement and "[n]egative for joint swelling, arthralgias, gait problem and falls"), 1108 (noting left knee looked "normal" and could "bend and bear weight"), 1114 (finding crepitus, but no swelling in knee), 1117–22 (walked with cane, but exam found no lower extremity swelling, normal range of movement in left hip and knee, no joint tenderness, and full upper and lower extremity strength), 1133 (no left hip pain with gentle flexion, extension, and rotation).

As also noted by the ALJ, such findings and imaging led plaintiff's providers to recommend conservative treatment. R. 788 (discharged with pain medication), 829 (referral for physical therapy), 882 (directed to use ace bandage, bear weight as able, use crutches, if needed), 955–56 (discharge in less than one hour with lidocaine patch), 1133–36 (diagnosing hip bursitis and IT band syndrome and recommending physical therapy, etc., in 2011 and 2017).

Further, the ALJ correctly observed that plaintiff's conditions improved markedly with conservative treatment. R. 24. After just a month of physical therapy in 2011 for left thigh pain stemming from a tight IT band and bursitis, plaintiff reported feeling "much better," noted significant delay in the onset of any pain, and was discharged from physical therapy to home exercise. R. 588, 592, 604–05, 1133. Similarly, following therapy in late 2016 for left knee pain, plaintiff climbed stairs easily, walked to school "without pain," "tolerate[d] walking 4 blocks," and exhibited increased knee range of movement and close to full strength in his left knee and hip. R. 874–77; *see* R. 824 (classifying plaintiff as an "[i]ndependent community ambulator").

Although plaintiff now contends he may have sought to quit therapy due to poor results or his desire for a more vigorous home program, Pl. Mem. 3, at the time he expressly told the therapist that "'my knee is doing good [and] I want to try it on my own for a couple of months,'" consistent with the improvement noted above. R. 876.

Similarly, the record supports the ALJ's conclusion that plaintiff's neuropathic foot pain improved with gabapentin, and the ALJ's finding of the absence of foot deterioration or issues. R. 24. Contrary to plaintiff's argument, Pl.'s Mem. 3, the ALJ had no need to attempt to quantify this improvement because plaintiff himself in no way qualified it when speaking with his podiatrist. R. 1074–75. Plaintiff reported his improved status on January 13, 2016, several months after doctors increased his gabapentin dosage from 400 to 600 mg. R. 780–81, 805, 1074–75. Thereafter, no treatment record of continued complaints of neuropathic pain exists. *See, e.g.*, R. 829–79. This is consistent with exams and related testing records showing that the condition of plaintiff's feet remained stable over time and warranted no new medical intervention. R. 733–34, 743, 1074–75.

Finally, plaintiff argues the ALJ conducted an insufficiently detailed review of the medical record, contrary to the Appeals Council's directive. Pl.'s Mem. 3. In this vein, plaintiff also argues the ALJ failed to specify how often plaintiff needed to use a cane. *Id.* This argument suffers from two flaws. First, given a record of nearly 1,200 pages, it is neither feasible nor necessary for an ALJ to "specifically refer to every piece of evidence in his decision." *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). Instead, the ALJ's decision must "contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the . . . determination and the . . . reasons upon which it is based . . . ." 42 U.S.C. § 405(b)(1). ALJ Dodson's decision complied with this standard and the Appeals Council's remand order.

Second, the ALJ's discussion of plaintiff's cane usage necessarily flows from the record. The absence of a finding that plaintiff required a cane for moving about (and to what extent) was no oversight. The medical record lacks any indication that a medical professional prescribed a cane and specified how often it should be used. Plaintiff does not contend otherwise, and his brief contains no record citations to the contrary.[17] Instead, it appears that plaintiff decided on his own to use a cane in late October 2016, and in ensuing months. R. 835 (noting plaintiff showed up for therapy on October 20, 2016 with a mis-sized cane), 1117 (noting plaintiff's use of a cane "for left knee issues" on January 10, 2017); cf. R. 120 (noting plaintiff told SSA in June 2015 that the clinic gave him the cane, but that he used it only seven to ten days/month "because Neurontin helps his neuropathy most days").

Notwithstanding the foregoing and his finding that plaintiff's self-reported symptoms failed to fully align with mild to moderate exam findings, R. 23–24, 482 (noting full range of foot and ankle movement and 5/5 muscle strength in all groups), 492–93 (noting normal gait, strength, and range of movement), 499 (noting lack of joint tenderness and full upper and lower extremity strength), 788 (noting patient neurologically intact and walked with a steady gait), 1075 (noting

---

[17] The record before the Court contains a June 4, 2018 letter from Dr. Platzbecker, apparently written on a day the plaintiff visited the clinic. R. 33. Dr. Platzbecker opined that plaintiff has "functional limitations related to arthritis and degenerative disease . . . of his [l]eft hip, bilateral knees, and right ankle," resulting in an "antalgic gait for which he uses the aid of a cane to ambulate." Id. (also describing January 2017 hip x-rays and bone spurs in ankle). Dr. Platzbecker further opines that plaintiff "is able to ambulate with the assistance of a cane and able to walk for up to 20 minutes before being limited by pain" and "cannot walk or stand for extended periods of time." Id. Although dated June 4, 2018, this letter appears to have been submitted to the Appeals Council on December 10, 2018. R. 34. It was neither offered during the hearing nor considered by the ALJ. The Appeals Council decided "not [to] exhibit this evidence" and noted that it failed to show a "reasonable probability that it would change the outcome of the decision." R. 2. Because it was not presented to the ALJ, the Court cannot consider it on appeal. See Smith, 99 F.3d at 638 n.5. In the absence of good cause for plaintiff's failure to timely submit this letter on or before the date of the ALJ's decision, remand is also not appropriate. See 42 U.S.C. § 405(g).

full range of ankle and foot movement and full muscle strength), the ALJ acknowledged plaintiff's use of a cane. He did so, citing to a December 2016 record noting plaintiff's substantial therapeutic progress, as well as his continued use of a cane to ambulate. R. 878. Rather than wholly discounting plaintiff's cane usage when the medical record offered limited support for it, the ALJ gave plaintiff the benefit of the doubt. The ALJ decided, based upon the medical and non-medical evidence, including plaintiff's statements and his activities of daily living, that plaintiff was "limit[ed] . . . to walking and/or standing for four hours in an eight-hour workday," but retained an RFC for restricted, light work. R. 25; *see Cuffee v. Berryhill*, 680 F. App'x 156, 160 (4th Cir. 2017) (finding a claimant capable of light work where medical records showed she used a cane but had "progress[ed] to weight bearing as tolerated," declined further medical treatment for pain, treated pain conservatively with medication, and "capably performed activities of daily living," such as bathing, cooking, cleaning, and shopping). For the reasons noted above, that determination finds ample support in the record.[18]

---

[18] In arguing that plaintiff abandoned his DIB claim under duress, the last sentence of plaintiff's brief suggests, without more, that plaintiff "could have" a viable Title II claim based on his use of a cane and the grid rules applicable to persons over 50. Pl.'s Mem. 5. As plaintiff fails to elaborate on this argument, the Court declines to address it, other than to note that the ALJ addressed the matter. Specifically, the ALJ sought the VE's input about whether, in light of the erosion of the light unskilled occupational base caused by the limitations at issue, jobs existed in the national economy for a hypothetical person of plaintiff's age, education, past work experience, and RFC. R. 26–27, 67–68. The VE testified that significant numbers of jobs were available for such a person in the occupations of information clerk, office helper, and clerical checker. R. 27, 67–68. Thus, the ALJ's decision complied with pertinent law and regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(d); SSR 83-12, 1983 WL 31253, at *2–3; *see also Golini v. Astrue*, 483 F. App'x 806, 807–08 (4th Cir. 2012) (holding that where the claimant's RFC falls between two exertional levels, the grid rules do not direct a finding, and it is appropriate for the ALJ to rely on the testimony of a vocational expert).

2.     *The ALJ also complied with the remand order and properly weighed Dr. Mirshahi's medical source statement.*

Plaintiff also argues the ALJ violated the remand order by summarizing, but failing to analyze Dr. Mirshahi's treatment records and opinions, and by failing to explain why he deemed those opinions to be extreme. Pl.'s Mem. 3–4. As the Appeals Council characterized Dr. Mirshahi as a treating physician, his opinions should be analyzed according to the treating physician rule.

For claims like plaintiff's, filed before March 27, 2017,[19] a treating provider's opinion merits "controlling weight," under federal regulations and Fourth Circuit authority, if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017). Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. However,

> a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.

SSR 96-2p, 61 Fed. Reg. 34490, 34491, 1996 WL 374188, at *4 (July 2, 1996).

When an ALJ assigns other than controlling weight to a treating provider's opinion, it is "still entitled to deference and must be weighed using all of the factors" provided by the regulations. *Id.* The main factors are: (1) the examining relationship, giving more weight to

---

[19] On January 18, 2017, SSA promulgated a final rule that revised its medical evidence rules, including the treating physician rule, and specified that the revisions apply to claims filed on or after March 27, 2017. *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844–01, 2017 WL 168819 (Jan. 18, 2017).

sources who have examined a claimant; (2) the treatment relationship, looking at the length, nature, and extent of the treatment relationship; (3) supportability, based upon the extent of the evidence presented in support of the opinion; (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. §§ 404.1527(c), 416.927(c) (also noting ALJ's obligation to "give good reasons . . . for the weight" given to a treating source opinion); *see Brown v. Comm'r of Soc. Sec.*, 873 F.3d 251, 256 (4th Cir. 2017) (noting that the first two factors are "specific to treating sources," while the latter three apply to evaluating medical opinions from both treating and non-treating sources).

The ALJ must also explain the weight assigned to *all* opinions, including treating sources, non-treating sources, state agency consultants, and other non-examining sources. 20 C.F.R. §§ 404.1527, 416.927. Therefore, when the ALJ's decision is not fully favorable to the claimant, the decision must contain

> specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p. This specificity requirement is necessary because a reviewing court

> face[s] a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

The ALJ committed no error in attributing little weight to Dr. Mirshahi's opinions and in characterizing his findings as "extreme." R. 25. The ALJ also evaluated those opinions consistent

with the remand order.  Dr. Mirshahi, an internal medicine resident, treated plaintiff one time on December 14, 2015, primarily for complaints related to hyperlipidemia and hemoptysis.  R. 893–94, 999–1000, 1016–18, 1069–74.  Notwithstanding this limited treatment relationship, its primary focus upon matters other than plaintiff's knees, hips, and diabetes, and Dr. Mirshahi's apparent lack of specialization in orthopedics, endocrinology, or neurology, he completed a single-page medical source statement on February 11, 2016.  R. 807.  Aside from its listing of plaintiff's diagnoses, this statement utilized check marks to identify associated problems, and Dr. Mirshahi's opinions, without explanation or reference to supporting facts.  *Id.* (noting plaintiff could, without accommodations, sit less than two hours and stand/walk less than two hours in a normal workday, would miss work "4+ days/month" due to his condition).  *Id.; see Cummins v. Colvin*, No. 2:14cv165, 2015 WL 1526188, at *3 (E.D. Va. Apr. 2, 2015) (noting a "distaste . . . for medical reports that do not contain at least a minimal amount of written explanation").  "Such check-the-box forms, unaccompanied by explanations are weak evidence at best, and not entitled to great weight even when completed by a treating physician." *Cummins*, 2015 WL 1526188, at *12 (citing *McConnell v. Colvin*, 2:12cv5, 2013 WL 1197091, at *6 (W.D. Va. Mar. 25, 2013)); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993).

As the ALJ concluded, these unsupported conclusions, from one not specializing in treating orthopedic and diabetic problems, were outliers, entitled to neither controlling nor significant weight.  *See Willis v. Colvin*, No. 2:13cv184, 2014 WL 1902383, at *15 (E.D. Va. May 8, 2014) (finding substantial evidence supported giving a treating physician's opinion less than controlling weight where the physician's statement was "not supported by medical records or explanations" and had "no evidentiary support").  The ALJ found more reliable the findings of an orthopedist, who first treated plaintiff in 2011 and was familiar with imaging dating back to 2010, who found

33

little evidence of arthritis in plaintiff's 2017 hip x-rays, and recommended physical therapy for bursitis and IT band pain. R. 25, 1133–36, 1142. As also noted by the ALJ, plaintiff's conditions not only significantly and objectively improved with prior, similar conservative treatment, but plaintiff also subjectively recognized this. R. 24–25, 874 (noting plaintiff viewed himself as no longer needing physical therapy in December 2016).

Unlike Dr. Mirshahi, who apparently relied mostly upon plaintiff's negative self-assessment, the ALJ found examinations and results from plaintiff's entire treatment history to be more compelling. The ALJ noted, for example, that: (1) x-rays of the right knee showed only mild osteoarthritis, R. 24, 802–04; (2) the absence of continued neuropathic pain following the increased dosing of gabapentin, R. 24, 780–81, 805, 1074–75; (3) the absence of deterioration or new issues with plaintiff's feet due to diabetic neuropathy, R. 24, 1074–75; (4) the "predominantly mild to moderate . . . findings" upon examination that were less than consistent with plaintiff's reported symptoms, R. 23–24; and (5) plaintiff's "treatment has been conservative," R. 24.

The ALJ explained and reasonably concluded that the medical record, including the moderate weight attributed to the opinions of state agency physicians who found plaintiff able to perform restricted, light work, failed to support the loss of functioning alleged by plaintiff. R. 24–25. Inasmuch as Dr. Mirshahi treated plaintiff only one time, mostly for conditions not at issue in his claim for disability, and his opinions are conclusory and inconsistent with the record, substantial evidence supports the ALJ's decision to accord them little weight.

## VI.   RECOMMENDATION

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 14) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 15) be **GRANTED**.

## VII.   REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.     Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.     A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/

Robert J. Krask
United States Magistrate Judge

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
November 17, 2020